IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RYAN G. CARTER, *et al.*,

    *Plaintiffs*,

v.

    Civil Action No. ELH-21-1315

UNITED STATES OF AMERICA,

    *Defendant*.

**MEMORANDUM OPINION**

Plaintiffs Ryan G. Carter and his wife, Kathleen E. Cole, have filed a tort suit against the United States of America (the "Government") (ECF 1), "pursuant to and in compliance with" the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, and the "National Defense Authorization Act" ("NDAA"), 10 U.S.C. § 2733 *et seq. Id.* ¶ 17.[1]  The suit stems from cervical spine surgery performed on Carter at Walter Reed National Military Medical Center ("Walter Reed") on April 6, 2018.  Tragically, the surgery left Carter with life altering, substantial, and permanent injuries.  *See* ECF 1, ¶¶ 24-39.

---

[1] As the Government notes (ECF 18-1 at 15-17), plaintiffs' reference to the "NDAA" is somewhat confusing. "NDAA" is the name given to the defense policy bill annually passed by Congress. *See, e.g.*, National Defense Authorization for Fiscal Year 2022, Pub. L. No. 117-81, 135 Stat. 1541 (2021). The provision of law cited by plaintiffs, 10 U.S.C. § 2733, is contained within the Military Claims Act ("MCA"), 10 U.S.C. § 2731 *et seq.*, which provides an administrative mechanism to settle certain claims against the United States for personal injury, death, or property damage caused by a DoD civilian employee or service member. *See Minns v. United States*, 974 F. Supp. 500, 507-08 (D. Md. 1997), *aff'd*, 155 F.3d 445 (4th Cir. 1998).

The Government suggests (ECF 18-1 at 16-17) that plaintiffs' use of the term "NDAA" is a reference to an amendment to the MCA contained in the National Defense Authorization Act for Fiscal Year 2020. *See* Pub. L. No. 116-92, Div. A, Title VII, Subtitle C, § 731(a)(1), 133 Stat. 1198, 1157-60 (2019). Codified at 10 U.S.C. § 2733a, this amendment permits service members to file administrative claims for injuries incident to service caused by medical malpractice, in some contexts. This issue is discussed further, *infra*.

Plaintiffs lodge three counts against the Government: "Medical Negligence" (Count I); "Loss of Consortium" (Count II); and "Informed Consent" (Count III). *See* ECF 1, ¶¶ 45-62. The Complaint is supported by numerous exhibits. ECF 2-3 to ECF 2-17.[2]

The Government has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) (ECF 18), supported by a memorandum (ECF 18-1) (collectively, the "Motion") and numerous exhibits. ECF 18-2 to ECF 18-9. According to the Government, the suit is barred by the doctrine first articulated by the Supreme Court in *Feres v. United States*, 340 U.S. 135 (1950).

Plaintiffs oppose the Motion. ECF 21 (the "Opposition"). The Government has replied (ECF 28, the "Reply"), supported by additional exhibits. ECF 28-1 to ECF 28-7.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I am compelled to grant the Motion.

## I. Factual Background[3]

### A.

In April 2018, Carter was a 43-year-old Air National Guard Staff Sergeant. ECF 1, ¶ 23.[4] He is married to Cole. *Id*. ¶ 9. Carter enlisted in the Maryland Air National Guard and the Air

---

[2] The exhibits were docketed separately from the Complaint.

[3] As discussed, *infra*, because the Government mounts a factual challenge to subject matter jurisdiction, I "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[4] The Complaint and the briefing refer to Carter as a Staff Sergeant ("SSgt"). However, as the Motion notes (*see* ECF 18-1 at 2 n.2), some documents refer to Carter's rank as Tech Sergeant ("TSgt"), suggesting he was promoted from Staff Sergeant to Tech Sergeant "in the final months or years prior to his retirement." *Id*. This issue is not material.

National Guard of the United States in 2009.  ECF 18-2 (Decl. of Bernard E. Doyle, Associate General Counsel, National Guard Bureau), ¶ 5.[5]  "The Air National Guard of the United States is a Reserve Component of the United States Air Force."  *Id.*

Carter attended "initial active duty training," which is "commonly known as 'basic training,'" in February and March 2010, at Lackland Air Force Base in San Antonio, Texas.  *Id.* ¶ 6; *see* ECF 18-4 (initial active duty training order).  Between April and November 2010, Carter also completed "'technical school' training" at Kessler Air Force Base in Biloxi, Mississippi, and Sheppard Air Force Base in Wichita Falls, Texas.  ECF 18-2, ¶ 7; *see* ECF 18-4; ECF 18-5; ECF 18-6; ECF 18-7 (training orders).

According to the Complaint, as of April 2018, Carter had "a medical history that included degenerative cervical disk disease, chronic neck pain, difficulty with fine motor skills, as well as numbness and tingling in his fingers."  ECF 1, ¶ 23.  The Complaint does not include any allegations as to the origin of Carter's medical conditions.  But, materials submitted by the Government reflect that Carter's medical conditions derived, at least in part, from injuries he sustained during basic training.  Doyle avers: "In early 2010 SSgt Carter sustained injuries after falling from a pull-up bar during his basic training.  It is my understanding that SSgt Carter has experienced ongoing medical issues since that injury."  ECF 18-2, ¶ 7.  Carter does not contest the government's assertions.

Similarly, according to Charles P. Franz, Jr., the Associate General Counsel for the Defense Health Agency ("DHA"), Carter "sustained injuries after falling from a pull-up bar during his basic

---

[5] Doyle reviewed a number of records relating to Carter's employment and service with the Air National Guard. ECF 18-2, ¶¶ 2, 3.

training." ECF 18-9 (Franz Decl.), ¶ 5.[6] "Since that fall, TSgt Carter has reported a progression of steadily worsening symptoms, including chronic back pain in his leg, back, shoulder and neck, increased difficulties with fine motor skills, and reoccurring numbness and tingling in his fingers and other extremities." *Id.* ¶ 6.

Carter continuously sought and received care for "these and other symptoms" from Walter Reed and other military hospitals and medical providers. *Id.* ¶ 7. Walter Reed, previously known as the "National Naval Medical Center," is located in Bethesda, Maryland, and is a "military hospital or treatment facility" managed by the DHA, a "combat support agency within" the Department of Defense ("DoD"). *Id.* ¶ 2. Beginning in May 2015, Carter was seen and evaluated at Walter Reed for these symptoms, and was diagnosed by Walter Reed physicians with "cervical spondylotic myelopathy." *Id.* ¶ 8.[7]

An order submitted with the Complaint reflects that Carter was activated to active duty status for the period from August 27, 2017, to March 27, 2018, for service with the 175th Wing of the Maryland Air National Guard in support of "Operation Freedom's Sentinel." ECF 2-16 (the March 23, 2018 Order) at 2.[8] This period was later shortened to end on March 13, 2018. *Id.* According to the order (*id.* at 2), the legal authority for this activation was 10 U.S.C. § 12301(d), which provides: "At any time, an authority designated by the Secretary concerned may order a

---

[6] Franz reviewed medical records and administrative claims related to Carter. ECF 18-9, ¶¶ 3, 4.

[7] The Court may take judicial notice that "[c]ervical spondylotic myelopathy is damage to the spinal cord in the neck." *Cervical spondylotic myelopathy*, COLUMBIA UNIV. IRVING MED. CTR., https://www.neurosurgery.columbia.edu/patient-care/conditions/cervical-spondylotic-myelopathy (last visited May 9, 2022); *see also* Fed. R. Evid. 201.

[8] "The term 'active duty' means full-time duty in the active military service of the United States." 10 U.S.C. § 101(d)(1).

member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member."

Colonel Joed I. Carbonell of the United States Air Force was Carter's commanding officer for Carter's active duty tour that began in August 2017.  ECF 28-1 (Carbonell Decl.), ¶ 2.  Materials included by the Government with the Reply, including a Declaration by Carbonell, provide more details as to Carter's active duty service.

Carbonell avers: "In August 2017, I issued the special orders, which activated SSgt Carter to active duty with the [Maryland Air National Guard 276 Cyberspace Operations] Squadron to perform duties, pursuant to 10 U.S.C. § 12301(D), in support of Operation Freedoms SE [sic]." *Id.* ¶ 7.[9]  As noted, the active duty period originally was from August 27, 2017, to March 27, 2018, but the end date was later changed to March 13, 2018.  *See* ECF 2-16; ECF 28-2; ECF 28-3; ECF 28-4 (orders).  During this period, Carter worked under Carbonell's command "as a Cyber Operations Planner supporting Air Forces Cyber and the Cyber National Mission Force."  ECF 28-1, ¶ 8.

According to Carbonell, in 2017 Carter was "assigned to a position as a military technician (dual status)."  *Id.* ¶ 6.  "Military technicians (dual status) are full-time, federal civilian employees whose employment is conditioned on maintaining their military position in the National Guard." *Id.*  As a dual status military technician, Carter was required to maintain membership in the Maryland Air National Guard, meaning he was obligated to attend "inactive duty training one weekend a month as well as two weeks of annual training a year."  *Id.*; *see also* 32 U.S.C. § 502

---

[9] This appears to be a typographical error. The name of the operation is Operation Freedom's Sentinel. *See* ECF 2-16 at 2; ECF 28-2 at 1.

(specifying National Guard training requirements); 32 U.S.C. § 709 (authorizing dual status military technicians).

## B.

Carbonell avers that he "was aware that SSgt Carter sought and received medical care as an active duty service member from [Walter Reed] during [Carter's service in the unit, from August 27, 2017, to March 13, 2018], for a spinal injury that he sustained while in basic training." ECF 28-1, ¶ 8.

According to Franz, during an evaluation of Carter at Walter Reed on or around March 1, 2018, "it was recommended" to Carter that he undergo surgery "in order to alleviate and prevent the worsening of the pain, radiculopathy, and other symptoms he was experiencing in his neck." ECF 18-9, ¶ 9.  On or about April 6, 2018, Carter "presented" to Walter Reed "for anterior cervical discectomy and fusion ('ACDF') surgery in connection with a diagnosis of cervical spondylotic myelopathy." ECF 1, ¶ 24.[10]

The surgery was performed by Bradley A. Dengler, M.D., "with general endotracheal tube anesthesia administered and monitored by the anesthesia team." ECF 1, ¶ 25.[11]  Plaintiffs allege that "[i]ntraoperatively, the procedure was complicated by a loss and/or depression in neurophysiological signals during the negligent placement of a trial spacer at the C4/5 level." *Id.* ¶ 27.  After the discectomy, Carter awoke from anesthesia and was "unable to move his extremities." *Id.* ¶ 28.  "Thereafter, Mr. Carter was again sedated and sent emergently for an MRI to evaluate for injury to his cervical cord.  The results of the MRI showed a slight increase in the

---

[10] In general, the Complaint does not define or explain its medical terminology.

[11] In ECF 1, ¶¶ 44, 48, plaintiffs identify 30 health care providers involved with Carter's surgical procedure and subsequent medical care.

T2 signal within the spinal cord at the C4/5 level." ECF 1, ¶ 29. Given these "T2 hypersensitivities," Carter "underwent a posterior C3-6 laminectomy and fusion that same day." *Id*. ¶ 30. This second procedure was likewise recommended and performed by Dr. Dengler. *Id*.

"Postoperatively, Mr. Carter was transferred to the Surgical ICU, intubated and sedated, and with persistent motor and sensory deficits." *Id*. ¶ 31. Upon admission, he was reported to have an "ASIA A spinal cord injury with a motor score of two." *Id*. ¶ 32. "In the hours and days that followed, Mr. Carter underwent examination and testing, including CT, MRI, and ultrasound imaging to determine the cause, nature, and extent of his diminished postoperative neurological function and pain." *Id*. ¶ 33. A postoperative MRI showed "'persistent severe spinal canal stenosis from C3-C5' indicating that the surgery was unsuccessful." *Id*. ¶ 34. Carter was monitored at the Walter Reed Surgical ICU for approximately three weeks after the surgery, where he also underwent wound care, physical therapy, recreational therapy, and occupational therapy. *Id*. ¶ 37; *see also* ECF 18-9, ¶ 13. However, his hospital treatment was "complicated" by "a left upper extremity deep vein thrombosis ("DVT") for which he was initially anticoagulated with heparin and later transitioned to Lovenox (enoxaparin)." ECF 1, ¶ 36.

On or about April 25, 2018, Carter was transferred from Walter Reed to the Hunter Holmes McGuire Veterans Affairs ("VA") Medical Center in Richmond, Virginia, for comprehensive spinal cord injury rehabilitation therapy. *Id*. ¶ 38; *see also* ECF 18-9, ¶ 14. There, Carter received "continued rehabilitation therapy for ASIA B tetraplegia due to his April 6, 2018 spinal cord injury, as well as ongoing treatment for his neurogenic bladder, neurogenic bowel, oropharyngeal dysphagia, pressure ulcers of sacral and gluteal regions, spasticity, obstructive sleep apnea, obstruction of the pelvic-ureteric junction, adjustment disorder with mixed emotions, generalized anxiety disorder, and depression." ECF 1, ¶ 39. And, he underwent several operative procedures,

including "the debridement of his right buttock wound, cystoscopy with left retrograde pyelogram, and cystoscopy and suprapubic catheter placement."  ECF 1, ¶ 40.

"At the time of his surgery on April 6, 2018, and at all time [sic] when he received care and treatment at [Walter Reed], TSgt Carter was a member of the Air National Guard."  ECF 18-9, ¶ 18.  However, the specific details are more complicated.

As noted, Carter's active duty status ended on March 13, 2018.  However, the Complaint alleges that on or about June 27, 2018, Carter's duty status was "retroactively converted from 'inactive duty' to 'active duty'" as of March 14, 2018.  ECF 1, ¶ 41.  The Complaint includes a "Verification of an Air National Guard Call to Duty Order," signed by Colonel Carbonell and dated June 27, 2018.  ECF 2-17.  The document identifies the "Type of Duty/Authority" as "Active Duty for Operational Support Medical Hold," and cites 10 U.S.C. § 12301(h).  ECF 2-17 at 2.[12]

---

[12] 10 U.S.C. § 12301(h) provides:

(1) When authorized by the Secretary of Defense, the Secretary of a military department may, with the consent of the member, order a member of a reserve component to active duty—

(A) to receive authorized medical care;
(B) to be medically evaluated for disability or other purposes; or
(C) to complete a required Department of Defense health care study, which may include an associated medical evaluation of the member.

(2) A member ordered to active duty under this subsection may, with the member's consent, be retained on active duty, if the Secretary concerned considers it appropriate, for medical treatment for a condition associated with the study or evaluation, if that treatment of the member is otherwise authorized by law.

(3) A member of the Army National Guard of the United States or the Air National Guard of the United States may be ordered to active duty under this subsection only with the consent of the Governor or other appropriate authority of the State concerned.

And, the document refers to an "Itinerary" beginning March 14, 2018, and ending June 11, 2018. ECF 2-17 at 2.  The Complaint does not include any further allegations as to this retroactive conversion, including as to the motivation for doing so.  However, the Opposition hypothesizes, without citation to evidence, that the conversion was "presumably due to the nature and severity of [Carter's] newfound medical situation."  ECF 21-1 at 5.

Materials included with the Reply provide further details as to these circumstances. Colonel Carbonell avers that he was aware of Carter's scheduled surgery, but not aware that it was to occur after Carter completed his active duty tour.  ECF 28-1, ¶ 8.  He asserts: "As a military technician (dual status) and drilling member of the Maryland Air National Guard, SSgt Carter normally would not have been eligible for medical care or surgery at a military hospital, such as Walter Reed."  *Id*. ¶ 9.  Therefore, he "assumed when [Carter] had left the Squadron that SSgt Carter had received special orders extending his active duty to receive medical treatment."  *Id*. However, reviewing Carter's records after the surgery, he "realized" that Carter "had received medical treatment after his active duty tour without having first obtained orders continuing active duty status for medical treatment. Thus, SSgt. Carter was not qualified to receive the sought [sic] medical treatment and care at Walter Reed."  *Id*. ¶ 10.

Accordingly, Carbonell issued a series of orders modifying Carter's status, activating him to active duty status "so that he could be placed on 'Medical Hold.'"  *Id*. ¶ 11.  First, on April 18, 2018, he issued an order placing Carter on a "Special Medical Training Hold" under 32 U.S.C. §§ 502(f)(1)(B) and 503.  *Id*.; *see* ECF 28-5 (the "April 18, 2018 Order"). [13]  This order specified

---

[13] 32 U.S.C. § 502(f)(1)(B) authorizes a member of the National Guard to be ordered to perform additional training or duty with his consent, with or without pay. 32 U.S.C. § 503, as relevant here, authorizes a "limited number of members of the Air National Guard" to attend service schools except the United States Air Force Academy, and to "be attached to an organization of the Air Force corresponding to the organization of the Air National Guard to which the member

an "Itinerary" period of March 14, 2018, to June 11, 2018.  ECF 28-5 at 1.  The order advised:

"The purpose of this extension is to allow additional time to assess the member's medical condition

and for the medical treatment facility (MTF) toinitiate [sic] or complete a LOD,[14] determine

whether the medical condition renders the member unable to meet retention or mobility standards,

and provide medical documentation to support a request for MEDCON orders, if applicable."  ECF

*Id*.  This order also states: "The Verbal Orders of the Commander (VOCO) on 14 Mar 2018 are

confirmed; circumstances prevented written orders in advance."  *Id.* at 2.  However, the Order

apparently did not place Carter on active duty.

Carbonell subsequently issued two orders placing Carter on active duty.  ECF 28-1, ¶ 11.

The first, dated May 30, 2018, placed Carter on active duty for the period from June 11, 12, 2018,

to July 11, 2018.  ECF 28-6 (the "May 30, 2018 Order") at 1.  The May 30, 2018 Order identifies

the "Type of Duty/Authority" as "Activation Medical Hold," citing to 10 U.S.C. § 12301(h).  *Id*.

at 1.  It states: "Member is being extended under this authority pending resolution of a medical

issue."  *Id*.  The May 30, 2018 Order also describes the "Reserve Active Duty Reason" as "K – 10

USC 12301 (H) Voluntary Tour for Medical Treatment."  *Id*. at 2.  In addition, it advises: "While

performing under these orders, member is subject to the Uniform Code of Military Justice."  *Id*. at

1.

The second order is dated June 27, 2018.  ECF 28-7 (the "June 27, 2018 Order").  It is

generally similar to the May 30, 2018 Order.  The "Type of Duty/Authority" is given as "Active

Duty for Operational Support Medical Hold," citing to 10 U.S.C. § 12301(h).  *Id*. at 1.  And, the

---

belongs, for routine practical instruction at an air base during field training or other outdoor
exercise."

[14] The acronym "LOD" is not defined.

dates for duty are March 14, 2018, to June 11, 2018.  ECF 28-7 at 1.  Similar to the April 18, 2018

Order, but unlike the May 30, 2018 Order, the June 27, 2018 Order states: "The Verbal Orders of

the Commander (VOCO) on 14 Mar 2018 are confirmed; circumstances prevented written orders

in advance."  *Id*. at 2.  This is the retroactive conversion order alleged in the Complaint (*see* ECF

1, ¶ 41), although the Complaint includes a slightly different "verification" document.  *See* ECF

2-17.

Carbonell describes being on "medical hold" as a type of active duty, and explains that

someone on medical hold can still be subject to the same types of military orders as any other

active duty service member.  ECF 28-1, ¶ 12.  He concludes his Declaration by stating, *id*. ¶¶ 13-

14:

> These orders were issued at SSgt Carter's request and in coordination with
> the 175th Medical Group—an entity responsible with administering medical
> benefits for the Air National Guard—because if SSgt Carter had been considered
> to be in his status as a military technician and drill status guardsmen at the time of
> the surgery, he could not have been found injured in the line of duty. Had SSgt.
> Carter not been injured in the line of duty, he would not have been eligible for pay
> and benefits, continuing medical treatment, disability and medical retirement
> benefits, and veterans' benefits after he was discharged from military service. . . .
>
> The decision to issue these orders was made in light of the foregoing, but
> particularly because SSgt. Carter's [sic] requested it. In issuing these orders, no
> consideration was given to potential administrative claims or litigation.

Although the Carbonell Declaration was included with the Reply, plaintiffs have not sought

to contest the circumstances described in Carbonell's Declaration.  As mentioned, the Complaint

alleges retroactive conversion based on an order of June 27, 2018, consistent with the Declaration.

*See* ECF 1, ¶ 41.  However, it does not provide any further detail.

In particular, Carter has not specified whether he requested the retroactive conversion to

active duty status in order to obtain medical care through the military.  However, and of import,

the authorizing statute, 10 U.S.C. § 12301(h), permits medical activation only with the "consent

11

of the member." Furthermore, both the May 30, 2018 Order and the June 27, 2018 Order describe the reason for activation as a "*voluntary* tour for medical treatment." ECF 28-6 at 2; ECF 28-7 at 2 (emphasis added).

The Government's declarants agree that Carter's eligibility for surgery at Walter Reed on April 6, 2018, was premised on his military service. But, there seems to be some disagreement, or at least a lack of clarity, as to whether Carter had to be on active duty status to undergo the surgery. As discussed, Colonel Carbonell apparently believes that Carter was not eligible for the surgery at Walter Reed, a military hospital, unless he was on active duty status. *See* ECF 28-1, ¶¶ 9-10. For his part, Franz avers that Carter "was able to receive medical treatment and evaluation at [Walter Reed], including his April 6, 2018 surgery, because of his service in the Air National Guard," but states that Carter "would have received the same medical treatment and April 6, 2018 surgery, regardless of whether he was on active or inactive duty status." ECF 18-9, ¶ 19.

Doyle asserts: "As a matter of law and regulation, SSgt Carter would not have been eligible for the medical care and surgery he received at any of the military hospitals he visited, including [Walter Reed], unless he was enrolled in the Defense Enrollment Eligibility Reporting System ("DEERS")." ECF 18-2, ¶ 10. But, Doyle provides no explanation as to what DEERS is, or its implications in this case.

Doyle directs the Court's attention to a DoD policy regarding "Benefits for Members of the Uniformed Services, Their Dependents, and Other Eligible Individuals," and specifically to the section covering "Benefits for National Guard and Reserve Members of the Uniformed Services." *See* ECF 18-3 at 11-12. Doyle does not highlight any particular part of this section. But, the policy appears to specify that National Guard members are only eligible for "direct care" at "military

treatment facilities" if they are on active duty for periods greater than thirty days.  ECF 18-3 at 11; *see id*. at 8, 54 (defining abbreviations).

## C.

Carter was discharged from Hunter Holmes McGuire on or about April 8, 2019, and transferred to Care Meridian Nursing and Rehabilitation in Littleton, Colorado, for continued spinal court injury rehabilitation.  ECF 1, ¶ 42; *see also* ECF 18-9, ¶¶ 15-16.  While at Care Meridian, Carter was enrolled in the VA Eastern Colorado Health Care System.  ECF 1, ¶ 42.  In April 2021, Carter relocated to Tampa, Florida, "to be closer to his family." *Id*. ¶ 43.  He receives outpatient care and treatment, including rehabilitation therapy, through the James A. Haley Veterans' Hospital.  *Id*.; *see also* ECF 18-9, ¶ 17.

On November 1, 2019, an Informal Physical Evaluation Board ("IPEB") found that Carter's "medical condition prevents him from reasonably performing the duties of his office, grade, rank or rating," and recommended that he be "permanently retired with a disability rating of 100%."  ECF 18-8 at 3.  The IPEB said: "*While on Active Duty orders*, the [service member] underwent cervical neck surgery in Apr 2018 for progressively worsening neck pain and radiculopathy.  Post surgery, [he] developed quadriplegia and has been receiving supportive/rehabilitative care since." *Id*. (emphasis added).  Then, on November 13, 2019, Carter signed a form indicating he agreed with the findings and recommended disposition of the IPEB, and waived his rights for any further appeal.  *Id*. at 16.  By order dated November 21, 2019, and effective January 27, 2020, Carter received medical retirement, due to 100 percent physical disability, and was relieved from active duty.  ECF 18-2, ¶ 9; *see* ECF 18-8 at 1 (November 21, 2019 Order).

Plaintiffs filed a complaint with the Maryland Health Care Alternative Dispute Resolution Office (the "Office") on or about November 25, 2020, together with a Certificate Report of Qualified Expert and Preliminary Report, and a Notice of Election to Waive Arbitration.  ECF 1, ¶¶ 1-3; *see* ECF 2-3; ECF 2-4; ECF 2-5.  On December 8, 2020, the Office issued an "Order of Transfer" to this Court.  ECF 1, ¶ 4; *see* ECF 2-6.  Plaintiffs also assert that they have "exhausted all administrative remedies and fully complied with the provisions of" the FTCA and 10 U.S.C. § 2733.  ECF 1, ¶ 20; *see* ECF 2-7 to ECF 2-15.  And, they state that under the FTCA, because the Government has not made a final disposition regarding these claims within six months of when they were originally filed, plaintiffs' claims "were effectively denied as of September 24, 2020." ECF 1, ¶ 21.

This litigation followed.  Plaintiffs allege that Dr. Dengler and a number of other Walter Reed health care providers were negligent in their care and treatment of Carter, breaching the applicable standard of care in a variety of ways.  ECF 1, ¶ 48.  As a result, according to the Complaint, Carter has suffered significant, permanent injuries.  *Id*. ¶ 49.  Carter and Cole, his wife, claim that they have suffered loss of consortium.  *Id*. ¶¶ 53-54.  Plaintiffs also allege that the Government "failed to timely, adequately, completely, and appropriately obtain [Carter's] informed consent."  *Id*. ¶ 58.

Additional facts are included in the Discussion, *infra*.

## II.  Legal Standards

### A. Rule 12(b)(1)

The Motion is premised entirely on the ground that the Court lacks subject matter jurisdiction.  Accordingly, it is brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Federal district courts are courts of limited jurisdiction; they possess "'only that power

authorized by Constitution and statute.'"  *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A.,*

*Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah*

*Servs., Inc.*, 545 U.S. 546, 552 (2005).  Simply put, "if Congress has not empowered the federal

judiciary to hear a matter, then the case must be dismissed."  *Home Buyers Warranty Corp. v.*

*Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523

U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only

function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation

omitted).  "Because jurisdictional limits define the very foundation of judicial authority, subject

matter jurisdiction must, when questioned, be decided before any other matter."  *United States v.*

*Wilson*, 699 F.3d 789, 793 (4th Cir.2012).

      Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of

evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc.*, 776 F.3d

271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll*

*Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.

1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction

under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving

party is entitled to prevail as a matter of law.'"  *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

      A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two

ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192

(4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be

denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  *Kerns*, 585

F.3d at 192; accord *Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).

In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction," *Kerns*, 585 F.3d at 192, "[u]nless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute.'" *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009), *cert. denied*, 558 U.S. 875 (2009). In a factual challenge, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In particular, "the district court may . . . resolve the jurisdictional facts in dispute by considering evidence . . . such as affidavits." *Vuyyuru*, 555 F.3d at 348. When appropriate, the court may also "hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations." *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999); *see also Schneider v. Donaldson Funeral Home, P.A.*, 733 Fed. App'x 641, 644 (4th Cir. 2018); *Kerns*, 585 F.3d at 192.

The Government contends that the Motion may be considered either as a facial or a factual challenge, and should be granted either way. *See* ECF 18-1 at 7 & n.7. It has submitted numerous exhibits. Because the exhibits are relevant to the resolution of the Motion, I will construe the Motion as a factual challenge and consider the submissions.

### B. The FTCA

"Absent a statutory waiver, sovereign immunity shields the United States from a civil tort suit." *Kerns*, 585 F.3d at 193-94 (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

But, to the extent that the United States has expressly waived sovereign immunity, a plaintiff may recover against the United States. *See*, *e.g.*, *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005) (citation omitted); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (holding that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed") (citation and internal quotation marks omitted).

The Complaint is brought under the FTCA. *See* ECF 1, ¶¶ 17, 18, 20, 21.[15]  Under the FTCA, Congress has waived the sovereign immunity of the United States, exposing it to tort liability for claims "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," so long as certain conditions are satisfied. 28 U.S.C. § 1346(b)(1); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008). But, "'the FTCA is strictly construed, and all ambiguities are resolved in favor of the United States.'" *Lins v. United States*, 847 Fed. App'x 159, 162 (4th Cir. 2021) (quoting *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995)).  Moreover, the United States may be liable under the FTCA only to the extent that a "private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), and only "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674.  Thus, "the substantive law of each state establishes the cause of action." *Anderson v. United States*, 669 F.3d 161, 164 (4th Cir. 2012).

However, the United States is not liable for *all* torts committed by federal employees. Section 1346(b) of Title 28 "grants the federal district courts jurisdiction over a certain category

---

[15] To the extent that plaintiffs also seek to invoke the Military Claims Act, or what they refer to as the NDAA, this issue is discussed, *infra*.  But, it does not alter the outcome.

of claims for which the United States has waived its sovereign immunity." *F.D.I.C. v. Meyer*, 510

U.S. 471, 477 (1994).  For a claim to fall within that "certain category," it must be:

> "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Id.*  (quoting 28 U.S.C. § 1346(b)(1)) (alterations in original).

In the Fourth Circuit, the plaintiff has the burden of establishing that an "unequivocal

waiver of sovereign immunity exists and that none of the [FTCA's] waiver exceptions apply to his

particular claim."  *Welch*, 409 F.3d at 651; *see also United States v. Clendening*, 19 F.4th 421, 426

(4th Cir. 2021) (same, in *Feres* context).[16]

### C. The *Feres* Doctrine

The *Feres* doctrine is an exception to the FTCA's waiver of sovereign immunity, although

it is not contained in the text of the FTCA.  It was first articulated by the Supreme Court in 1950,

in *Feres v. United States*, 340 U.S. 135, which was decided a few years after the enactment of the

FTCA.  Under *Feres*, FTCA claims are barred "for injuries to servicemen where the injuries arise

out of or are in the course of activity *incident to service*."  *Id*. at 146 (emphasis added).

Notably, the *Feres* doctrine has been the subject of intense criticism.  "Justices, judges, and

scholars have routinely noted the harsh results brought about by the doctrine, and many have

suggested *Feres* itself was wrongly decided."  *Clendening*, 19 F.4th at 431; *see also United States*

*v. Johnson*, 481 U.S. 681, 700-01 (1987) (Scalia, J., dissenting) ("*Feres* was wrongly decided and

---

[16] Plaintiff argues that the Government bears the burden of proving the applicability of a FTCA waiver exception, citing only Ninth Circuit case law. *See* ECF 21-1 at 7. The law in the Fourth Circuit is to the contrary.

heartily deserves the 'widespread, almost universal criticism' it has received.") (internal citation omitted).  However, as the Fourth Circuit has remarked, the Supreme Court has, if anything, broadened the applicability of *Feres* since it was first decided.  *See Clendening*, 19 F.4th at 428; *Aikens v. Ingram*, 811 F.3d 643, 651 (4th Cir. 2016); *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996).  Moreover, "despite the rampant criticism, the *Feres* doctrine still stands, and this Court is bound by it."  *Clendening*, 19 F.4th at 431; *see also Johnson*, 481 U.S. at 686.  Therefore, I turn to a discussion of the *Feres* doctrine.

"[T]he Fourth Circuit has said the sole task of a lower court deciding whether to apply *Feres* 'is to assess whether appellant's injuries *arose out of activity incident to service*.'"  *Colon v. United States*, 320 F. Supp. 3d 733, 740 (D. Md. 2018) (quoting *Stewart*, 90 F.3d at 104) (emphasis in *Stewart*).  "'In making this determination, [courts should be] mindful that, since its inception, the *Feres* doctrine has been broadly and persuasively applied by federal courts . . . .'"  *Colon*, 320 F. Supp. 3d at 740 (quoting *Stewart*, 90 F.3d at 104) (alteration in *Colon*).

The Fourth Circuit recently considered the *Feres* doctrine in *Clendening*, 19 F.4th 421.  In that case, the wife of a former active duty Marine officer who had died brought suit against the government.  She claimed her husband had died due to his exposure to contaminated water and environmental toxins while he was stationed at Camp Lejeune, North Carolina.  *Id*. at 425-26.  The Court determined that the suit was barred under the *Feres* doctrine.  *Id*. at 425, 431.  In reaching that conclusion, the Court summarized its *Feres* jurisprudence.

The Court recognized that the *Feres* doctrine is "admittedly 'broad and amorphous.'"  *Id*. at 427 (quoting *Aikens*, 811 F.3d at 651).  And, the Court observed that it had "remarked numerous times on the vast coverage of the *Feres* doctrine."  *Clendening*, 19 F.4th at 417.  Indeed, it noted that "'in recent years the [Supreme] Court has embarked on a course dedicated to broadening the

*Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military." *Id.* at 427-28 (quoting *Stewart*, 90 F.3d at 105) (alteration in *Clendening*; emphases in *Stewart*).

Moreover, the Fourth Circuit reiterated: "There is no 'specific element-based or bright-line rule' for determining whether certain conduct was 'incident to service.'" *Clendening*, 19 F.4th at 427 (quoting *Aikens*, 811 F.3d at 650); *see United States v. Shearer*, 473 U.S. 52, 57 (1985). "Instead, [the court] must ask whether 'particular suits would call into question military discipline and decisionmaking [and would] require judicial inquiry into, and hence intrusion upon, military matters.'" *Clendening*, 19 F.4th at 427 (quoting *Cioca v. Rumsfeld*, 720 F.3d 505, 515 (4th Cir. 2013)) (second alteration in *Cioca*); *see also United States v. Stanley*, 483 U.S. 669, 682 (1987). "'Put another way, where a complaint asserts injuries that stem from the relationship between the plaintiff and the plaintiff's service in the military, the incident to service test is implicated.'" *Clendening*, 19 F.4th at 427 (quoting *Cioca*, 720 F.3d at 515).

Of import here, the Fourth Circuit identified three "considerations" that are "relevant" as to whether a particular case falls under the *Feres* umbrella: "the duty status of the service member,[] whether the injury took place on base, and what activity the service member was engaged in at the time." *Clendening*, 19 F.4th at 428. However, the Court cautioned that these considerations "are not always determinative." *Id.* As to the duty status of the service member, "courts often examine whether the service member was on active duty (including while on liberty), leave, furlough, or entirely discharged at the time the wrongful act occurred," with "[t]hese statuses . . . usually considered on a spectrum." *Id.* at 428 n.4.

"Moreover, this test 'does not inquire whether the discrete injuries to the victim were committed in support of the military mission.'" *Id.* at 428 (quoting *Cioca*, 720 F.3d at 515). And,

"the 'focus' of the *Feres* doctrine 'is not upon when the injury occurs or when the claim becomes actionable, rather it is concerned with when and under what circumstances the negligent act occurs.'"  *Clendening*, 19 F.4th at 428 (quoting *Kendrick v. United States*, 877 F.2d 1201, 1203 (4th Cir. 1989)); *see also Aikens*, 811 F.3d at 651 ("[T]he situs of the injury is not as important as 'whether the suit requires the civilian court to second-guess military decisions . . . and whether the suit might impair essential military discipline.'") (quoting *Shearer*, 473 U.S. at 57).

In a footnote, the *Clendening* Court also observed: "'The Supreme Court has emphasized three broad rationales underlying the *Feres* doctrine: (1) the distinctly federal nature of the relationship between the government and members of the armed forces, (2) the availability of existing alternative compensation schemes in the military, and (3) the fear of damaging military structure and discipline.'"  *Clendening*, 19 F.4th at 427 n.2 (quoting *Kendrick*, 877 F.2d 1201 at 1204).

In *Appelhans v. United States*, 877 F.2d 309, 311 (4th Cir. 1989), the Fourth Circuit remarked: "In determining whether particular injuries were in fact 'incident to service,' courts typically look to the three rationales articulated above. Although some courts and commentators once questioned the continuing vitality of the first and second rationales, the Supreme Court recently reaffirmed the importance of all three rationales in [*Johnson*]."  *See Johnson*, 481 U.S. at 688-91 (discussing the three rationales).  But, more recent Fourth Circuit decisions have discussed the three rationales only in a cursory fashion or not at all.  *See, e.g.*, *Clendening*, 19 F.4th at 427 n.2 (mentioning the rationales only in a footnote); *Aikens*, 811 F.3d at 650-52 (not mentioning the rationales at all); *Cioca*, 720 F.3d at 512-17 (same).

In any event, in analyzing a *Feres* issue, "it is useful to keep [the three] rationales in mind . . . ."  *Colon*, 320 F. Supp. 3d at 739.  However, "the absence of one or more of them is no reason

to hear an FTCA claim against the government where *Feres* immunity would otherwise be appropriate." *Id*. at 739-40. Furthermore, "application of the *Feres* test does not depend on the military status of the alleged offender." *Aikens*, 811 F.3d at 651.

The discussion above makes clear that, in analyzing the applicability of the *Feres* doctrine, courts have focused in large part on the rationale as to military structure and discipline. The Supreme Court has "'explicitly rejected a special factors analysis which would consider how military discipline would actually be affected in a particular case.'" *Id*. (quoting *Ricks v. Nickels*, 295 F.3d 1124, 1130 (10th Cir. 2002)). Moreover, the rationale of "preserving military discipline . . . does not arise only when the lawsuit calls into question the orders of a superior officer." *Stewart*, 90 F.3d at 106. "[T]he relevant inquiry is not whether the particular lawsuit involves a challenge to a military order. Rather, the proper question is whether the plaintiff's claims 'are the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *Id*. (quoting *Shearer*, 473 U.S. at 59) (emphasis in *Shearer*).

Other cases make clear the breadth of the "incident to service" test. The Fourth Circuit said in *Aikens*, 811 F.3d at 651 (quoting *Hass for Use & Benefit of U.S. v. United States*, 518 F.2d 1138, 1141 (4th Cir. 1975)):

> "'Incident to service' is not, of course, a narrow term restricted to actual military operations such as field maneuvers or small arms instruction. It has been held that a member of the military is engaged in activity incident to his military service when he is enjoying a drink in a noncommissioned officers club, and when he is riding a donkey during a ballgame sponsored by the Special Services division of a naval air station, and while swimming in a swimming pool at an airbase."

In its Reply, the Government asserts that "*Feres* and its progeny have given rise to two discrete lines of defense for tort suits brought by military servicemembers against the federal government," namely a "predominant line" focusing on the "injured servicemember," and a

"second body of *Feres* jurisprudence" looking to "the nature of the challenged activity."  ECF 28 at 6 n.6.  According to the Government, this second body of jurisprudence has to do with cases involving judicial intrusion into issues of military discipline and management.  ECF 26 at 6 n.6. The Government maintains that this case falls within the first body of law, and so some cases cited by plaintiffs that spring from the second body are inapposite.  *Id*. at 6 n.6, 11.

But, the Government has offered no case law supporting its theory of two separate lines of *Feres* jurisprudence.  Indeed, the three Supreme Court cases the Government cites in its footnote do not hint at this division at all.  *See Stanley*, 483 U.S. 669; *Johnson*, 481 U.S. 681; *Shearer*, 473 U.S. 52.  To the contrary, the cases suggest a single, unified body of *Feres* jurisprudence, in which the issues labelled by the Government as belonging to the second body of law are considered as part of the overall analysis of whether an injury is incident to service.  *See, e.g.*, *Clendening*, 19 F.4th at 427-28; *Aikens*, 811 F.3d at 650-51; *Cioca*, 720 F.3d at 512-13.

### III.  Discussion

### A.

As noted, the sole ground for the Motion is that the *Feres* doctrine bars plaintiffs' suit. Accordingly, I turn to assess the application of the *Feres* doctrine to plaintiffs' claims.

The Government argues that because Carter is a military service member who received treatment by military medical professionals in a military hospital, for conditions stemming from an accident that occurred in basic training, his injury was "incident to service" and subject to *Feres*. ECF 18-1 at 10-11.  Although Carter was retroactively converted to active duty (*id*. at 12 n.10), the Government maintains that, even if Carter were on inactive duty status, the conclusion would be the same.  *Id*. at 12-14.

Plaintiffs devote much of their Opposition to a fulsome broadside against the *Feres* doctrine in general.  They argue that *Feres* is unsupported by the text of the FTCA; they challenge its rationale; and they label the doctrine "a license for tortious conduct and a mandate of secondclass citizenship for servicemen."  ECF 21-1 at 24.  Moreover, they urge the Court, if it determines that *Feres* applies, to "inspect the underlying rationales and disparate implications of *Feres* under a microscope and otherwise reconsider the practicality and applicability of *Feres* given the decades of widespread, universal criticism it has justly received."  *Id*. at 3.

As discussed, plaintiffs are hardly the first to assail *Feres*.  But, "despite the rampant criticism, the *Feres* doctrine still stands, and [this Court] is bound by it."  *Clendening*, 19 F.4th at 431.  Indeed, over the past several decades, the Supreme Court and the Fourth Circuit have consistently affirmed *Feres*.  *See, e.g.*, *Johnson*, 481 U.S. at 686; *Clendening*, 19 F.4th at 428; *Aikens*, 811 F.3d at 651; *Stewart*, 90 F.3d at 105.  "[T]he fact that the doctrine may in many cases lead to undeniably harsh results does not relieve this court of its obligation to apply precedent."  *Appelhans*, 877 F.2d at 313 (referring to *Feres*); *see, e.g.*, *Lockwood v. Prince George's Cty., Md.*, 58 F. Supp. 2d 651, 659 (D. Md. 1999) ("This Court is bound to follow the precedent of the United States Supreme Court and the Fourth Circuit.").

Beyond this criticism, plaintiffs contend that *Feres* does not apply here.  They argue that Carter's injuries were not incident to service because the surgery occurred while Carter was inactive and off-base; because the surgery was not related to any military decision and did not implicate military discipline; and because the *Feres* rationales do not apply.  ECF 21-1 at 2, 16-27.  The Government responds by asserting that plaintiffs misstate and misapply *Feres*.  ECF 28 at 6-16.  And, it maintains that Carter was, in fact, on active duty status at the time.  *Id*. at 12-14.

In the Motion, the government argues that Counts I and III (the medical negligence and informed consent claims) are directly barred by *Feres*, and that Count II (loss of consortium) is derivative of Counts I and III and therefore it must also be dismissed.  ECF 18-1 at 14-15; *see Kendrick*, 877 F.2d at 1206-07 ("The limits imposed by *Feres* are equally applicable when the claims of a family member are derivative to the service member's cause of action under the applicable state law."); *Rowe v. United States*, 37 F. Supp. 2d 425, 428 (D. Md. 1999) ("In that [plaintiff] has no viable malpractice claim [because of *Feres*], the plaintiffs' joint consortium claim, which is entirely dependent upon the existence of a valid underlying claim, must also be dismissed, under clear Fourth Circuit case law.") (citing *Minns v. United States*, 155 F.3d 445, 448 (4th Cir. 1998)).  Plaintiffs do not contest this point.  Therefore, it seems clear that the viability of the entire suit depends on *Feres*.

## B.

As a general matter, the "duty status of the service member" is not necessarily "determinative" in the *Feres* analysis.  *Clendening*, 19 F.4th at 428.  But, it is of significance.

Plaintiffs contend that Carter was on inactive duty status.  ECF 21-1 at 4, 6-7, 17-21.  The Government contends that, given the June 27, 2018 Order, Carter was on active duty status.  ECF 18-1 at 12 n.10; ECF 28 at 12-14.  At first glance, this issue may appear to be a factual dispute, of the type that could warrant an evidentiary hearing.  *See Kerns*, 585 F.3d at 192.  But,  the parties agree as to the basic sequence of events.

There is no dispute that Carter's active duty period originally ended on March 13, 2018, per his orders.  ECF 1, ¶ 41; ECF 2-16; ECF 28-1, ¶¶ 7-10; ECF 28-4.  There is no dispute that, as a result, at the time of Carter's surgery on April 6, 2018, he was not on active duty status.  ECF 1, ¶¶ 23-24, 41; ECF 28-1, ¶¶ 7-10.  And, there is no dispute that, pursuant to the June 27, 2018

Order, Colonel Carbonell retroactively converted Carter to active duty status for the period from March 14, 2018, to June 11, 2018—a period that included his surgery.  ECF 1, ¶ 41; ECF 2-17; ECF 28-1, ¶ 11; ECF 28-7.[17]  And, according to Colonel Carbonell, he did so with Carter's consent. ECF 28-1, ¶¶ 13-14; *see also* 10 U.S.C. § 12301(h) (specifying that active duty under this provision may only occur with member's consent).  Plaintiffs do not challenge the legality or validity of the June 27, 2018 Order.  The dispute is not over these facts, but rather over the legal significance of them under *Feres*.

If Carter were considered to be on active duty status for his surgery, it is clear that *Feres* would bar the claim as a matter of settled law.  This was the Fourth Circuit's holding in *Appelhans*, 877 F.2d 309, which concerned a medical malpractice suit by a plaintiff relating to treatment he received while at an Army hospital.  *Id*. at 310.  The plaintiff was on active duty status with the Army at the time, but because he had been sentenced to discharge by a court-martial for bad conduct and this sentence was under review on appeal, he had been placed on "indefinite excess leave."  *Id*.  In this status, the plaintiff did not receive pay, could hold civilian employment, and could travel anywhere in the continental United States as long as he kept the Army apprised of his whereabouts.  *Id*. at 312.  Nevertheless, he was still considered to be on active duty status, and so he was entitled to health care at military facilities, remained subject to the Uniform Code of Military Justice, and could be recalled at any time.  *Id*.

The Fourth Circuit agreed with the plaintiff that his "active duty status, standing alone, is insufficient to invoke the *Feres* doctrine's bar."  *Id*. at 311.  But, the Court held: "The fact that his injury occurred as a result of medical treatment by military doctors . . .  conclusively demonstrates

---

[17] As discussed, Carbonell also issued two orders prior to the June 27, 2018 Order. But, neither of these orders appears to have converted Carter to active duty status for the period including April 6, 2018. *See* ECF 28-1, ¶ 11; ECF 28-5; ECF 28-6.

that that injury was 'incident to service.'" *Id*.  And, it rejected the plaintiff's argument that his connection to the Army, on indefinite excess leave, was so "tenuous" as to defeat *Feres*.  *Id*. at 312-13.

*Scheppan v. United States*, 810 F.2d 461 (4th Cir. 1987), is also relevant.  There, the Fourth Circuit upheld the application of *Feres* to block a medical malpractice suit by a commissioned officer of the United States Public Health Service, who alleged that she had been injured during an elective surgery at an Indian Health Service hospital where she worked.  *Id*. at 462.  The plaintiff was on medical leave at the time of the surgery, and the Public Health Service, although it is one of the "uniformed services" of the United States, is not a part of the Armed Forces.  *Id*. at 462-63. Nevertheless, the Fourth Circuit affirmed that *Feres* applied.  *Id*. at 463.

As both the *Appelhans* Court and the Motion note, numerous other circuits have reached similar conclusions as to malpractice claims involving military medical facilities.  *Appelhans*, 877 F.2d at 312 (collecting cases); ECF 18-1 at 11 n.9 (collecting cases).  Indeed, two of the three cases that were consolidated into *Feres* itself involved medical malpractice claims against Army surgeons by active duty personnel.  *See Feres*, 340 U.S. at 137.

If Carter was not on active duty status at the time of his surgery, however, the analysis is more complicated.  The Government reads *Appelhans* for the broad assertion that *Feres* bars any malpractice suit for injuries sustained while being treated at a military hospital, regardless of active duty status.  *See* ECF 18-1 at 11.  Although certain portions of the opinion could be read to stand for such a proposition, it is clear from the opinion as a whole that the plaintiff's active duty status was at least a factor in the Court's analysis.  This is demonstrated, for example, in the Court's examination of whether the plaintiff being on indefinite excess leave rendered his connection to

27

the Army so tenuous as to preempt *Feres*. *See Appelhans*, 877 F.2d at 312-13. And, regardless, other case law paints a nuanced picture.

A few years after *Feres*, the Supreme Court decided *United States v. Brown*, 348 U.S. 110 (1954). In that case, the plaintiff was a "discharged veteran" who sued the Government for alleged negligence in regard to surgery on his knee at a Veterans Administration hospital. *Id*. at 110. The original injury to the plaintiff's knee occurred while he was on active duty, which led to his honorable discharge. But, the surgery was approximately seven years later. *Id*. The Court acknowledged that the plaintiff was at the veterans' hospital "because he had been in the service and because he had received an injury in the service." *Id*. at 112. It concluded that the case was not governed by *Feres*. *Id*. The Court said: "The injury for which suit was brought was not incurred while respondent was on active duty or subject to military discipline. The injury occurred after his discharge, while he enjoyed a civilian status." *Id*.

Two Fourth Circuit decisions further illustrate the complexity of this doctrine. They are *Kendrick*, 877 F.2d 1201, which was decided shortly after *Appelhans*, 879 F.2d 309, and *Bradley v. United States*, 161 F.3d 777 (4th Cir. 1998), which was decided nine years later.

In *Kendrick*, 877 F.2d at 1201-02, the Fourth Circuit confronted the application of *Feres* to a medical malpractice suit brought by an individual on the Army's "Temporary Disability Retired List" ("TDRL"). Disabled service members are placed on the TDRL while they are evaluated to determine whether they should be retired from the military as a result of their disability. *Id*. at 1203. As later described by the Fourth Circuit in *Bradley*, an individual on the TDRL receives retirement pay, is not considered to be on active duty, and cannot be recalled to active duty. *Bradley*, 161 F.3d at 781. To receive TDRL benefits, an individual is required only to present for regular examinations, pending the retirement determination. *Id*. A TDRL individual

28

is subject to the Uniform Code of Military Justice, but "failure to report for a required physical examination would only subject [the individual] to termination of pay and administrative discharge." *Id*.

In *Kendrick*, 877 F.2d at 1202, the plaintiff was injured in a car accident while on active duty, prescribed a medication, and two months later was placed on the TDRL.  He alleged that military physicians were negligent for continuing to prescribe the medication without monitoring for symptoms of toxicity.  *Id*.  The Fourth Circuit noted: "It is well established that receipt of medical care in military facilities by members of the military on active duty is 'activity incident to service' and thus a lawsuit against the United States arising from medical treatment of a service member on active duty is barred under *Feres*."  *Id*. at 1203.

The *Kendrick* Court found that this principle extended to Kendrick's case, for a few reasons.  First, the initial "alleged negligent act" of prescribing the medication commenced while the plaintiff was on active duty, under the case of military physicians.  *Id*.  In other words, "[a]ll of Kendrick's medical treatment arose out of an activity incident to service."  *Id*.  Second, he was not a civilian when the alleged negligent act occurred, and continued to be subject to military discipline throughout.  *Id*. at 1204.  Third, it was inappropriate to apply local tort law to a service member injury, such as this one.  *Id*.  Fourth, the plaintiff was already benefiting from veterans' benefits.  *Id*. at 1204-05.  Fifth, and finally, "to allow a service member on TDRL to maintain a tort action against the military would have a disruptive effect on military discipline, obedience and commitment, especially if the service member is later returned to active duty," as the plaintiff theoretically could have been.  *Id*. at 1205.  Permitting the suit would have a "chilling effect" on the military's decision making regarding disability issues.  *Id*. at 1206.  However, the Court noted:

"We do not hold that the *Feres* doctrine bars an action based upon a truly independent or post-service tort.  This is not such a case."  *Id*. at 1204 n.2.

The Fourth Circuit reached a contrary result in *Bradley,* 161 F.3d at 778.[18]  Like *Kendrick*, *Bradley* concerned an individual, Sharon Bradley, who was on the TDRL.  As a Navy medical laboratory technician, Bradley contracted a Staph A infection, became disabled, and was placed on the TDRL.  *Id*.  After this placement, Bradley scheduled an appointment at Walter Reed for bone grafting, to repair damage caused by the infection.  *Id*.  She was flown to Walter Reed in a military transport plane, during which time she began experiencing a high fever and severe chest pains.  *Id*.  Medical personnel took no action.  *Id*.  She was eventually admitted to the emergency room at Walter Reed several days later, and her condition deteriorated quickly.  *Id*.  She died of a Staph A infection.  *Id*.

The Fourth Circuit held that the *Feres* doctrine did *not* bar the suit.  The Court noted that the case was at the summary judgment stage, and it was a disputed fact as to whether the Staph A infection that killed Bradley was a reoccurrence of the previous Staph A infection that she acquired while on active duty.  *Id*. at 780-81.  But, the Court said, *id*. at 781: "[E]ven were we to conclude that Bradley's infection was a reoccurrence of the Staph A infection she received incident to service, the present facts would be distinguishable from those found to be controlling in *Kendrick*."  Unlike in *Kendrick*, "the allegedly negligent conduct giving rise to the claims of medical malpractice at issue here cannot be characterized as having begun while Bradley was on active duty," but rather while she was on the TDRL.  *Id*.  The fact that she received allegedly negligent treatment at Walter Reed, where she was entitled to seek treatment because of her prior active

---

[18] Suit in *Bradley* was brought by Sharon Bradley's husband on behalf of her estate. 161 F.3d at 778.

service, and the fact that she would not have travelled to Walter Reed but for her prior service-related injury, were "not controlling." *Id.*

The Court acknowledged Bradley's TDRL status, but found that although it was "not a full discharge, it is comparable to permanent retirement status, which has been held not to bar an FTCA claim under the *Feres* doctrine." *Id.* at 782 (citing *McGowan v. Scoggins*, 890 F.2d 128, 137-39 (9th Cir. 1989)). Thus, the Court rejected application of *Feres*. *Bradley*, 161 F.3d at 782.[19]

These cases reflect that, notwithstanding the breadth of the *Feres* doctrine, there do appear to be some limits on its application to medical malpractice injuries that occur when the plaintiff's relationship to the military is tenuous, even if the injuries were in some way related to the plaintiff's military service. At the same time, the Government points to several decisions by judges of this Court that support the idea that *Feres* applies even if the individual was on inactive duty status.

Foremost is *Rowe*, 37 F. Supp. 2d 425. A meaningful part of the Government's briefing is premised on *Rowe* (*see* ECF 21-1 at 13-14; ECF 28 at 14-16), and understandably so, given its similarities to this case.

In *Rowe*, 37 F. Supp. 2d at 426, the plaintiff was a member of the United States Naval Reserve. He sustained an injury to his knee while playing volleyball at the United States Naval Academy, during his annual active duty period. The plaintiff was put on "inactive reserve status" for surgery to repair the knee, which occurred at Walter Reed some eight months later. *Id.* He alleged that the "treatment . . . was negligent" and he was left disabled. *Id.*

Judge Smalkin held that *Feres* applied. He reasoned, *id.* at 426-27:

---

[19] *Bradley* is not easy to reconcile with *Kendrick*. The Fourth Circuit identified as a distinction whether or not the alleged initial negligent act began while the plaintiff was on active duty. But, much of the other reasoning in *Kendrick*, for example the import of TDRL status and the effect on military discipline, would also seem to apply to *Bradley*, and vice versa.

It remains well-settled, almost 50 years after *Feres*, that a service member cannot recover for medical malpractice arising out of care given in a military hospital. The cases are both legion and unanimous in applying *Feres* to bar malpractice actions brought by service members—even inactive reservists— against the Government on account of care rendered in a military medical facility. . . . The fact that Mr. Rowe was not on active duty while he was actually being operated upon is inconsequential in the application of the *Feres* doctrine's "incident to service" rule.

Judge Smalkin noted that "the *Feres* doctrine was applicable because the service member was, indeed, only entitled to treatment at a military medical facility in the first place because of [his] status as a member—*qua* member—of the Armed Forces." *Id*. at 427. And, he emphasized that the actual injury that led to the surgery was sustained while the plaintiff was on "active reserve status for training." *Id*.

*Rowe* cited three decisions, all out-of-circuit, regarding this issue. *Id*. at 427. In *Jackson v. United States*, 110 F.3d 1484 (9th Cir. 1997), the plaintiff lacerated his hand while at weekend inactive duty training with the Naval Reserve, and sued for malpractice regarding treatment received at a naval hospital the next day, when he was no longer in training. *Id*. at 1486. The Ninth Circuit held that although this status was relevant, *Feres* still applied, given that the initial injury arose out of activity incident to service; treatment was at a military facility; plaintiff received military benefits; and he was a member of the Naval Reserve throughout. *Id*. at 1487-89. In *Borden v. Veterans Administration*, 41 F.3d 763 (1st Cir. 1994), plaintiff sustained a knee injury while on active duty, but "off duty." *Id*. at 763. Given that he was on active duty and received medical treatment at a military facility, the First Circuit applied *Feres* to his malpractice claim. *Id*. at 763-64. Finally, in *Quintana v. United States*, 997 F.2d 711 (10th Cir. 1993), the Tenth Circuit applied *Feres* to a member of the Army National Guard who injured her knee while on "inactive duty training," and then sued for alleged malpractice stemming from her subsequent knee surgery at a military facility. *Id*. at 712. The Tenth Circuit stated that the plaintiff "is a servicemember

who was entitled to the surgery at [the military facility] precisely because of her military status and the surgery was performed by military servicemembers in a military hospital." *Id.*

The Government also cites *Colon*, 320 F. Supp. 3d 733. In *Colon*, the plaintiff served in the Army from 2004 to 2014, when she was discharged for medical reasons. *Id.* at 736. Near the end of her service, and continuing afterwards, she was involved in a protracted custody dispute with another Army officer, with whom she had an affair. *Id.* at 736-37. She alleged that in 2013 and then again in 2015, the officer convinced two Army doctors whom he knew to access the plaintiff's confidential health records, which he then attempted to use against her in the custody dispute in 2015. *Id.* Judge Hazel held that *Feres* barred the plaintiff's FTCA claims, because the plaintiff's injuries "arose out of her treatment by military doctors at military medical installations—treatment she received solely because she was a member of the military," and while she was on active duty. *Id.* at 740. Although the plaintiff's injury, and one of the alleged access incidents, did not occur until after the plaintiff was discharged, "the access was still incident to her service because it related to the use and management of her active duty medical records by a military doctor." *Id.* at 741.

In addition, a number of out-of-circuit cases confirm that, as a general matter, suits against reservists may be barred by *Feres* even for injuries sustained while not on active status, if the injuries are incident to service. *See, e.g.*, *Jackson*, 110 F.3d at 1486-89 (discussed *supra*); *Wake v. United States*, 89 F.3d 53, 57-62 (2d Cir. 1996) (*Feres* barred suit by member of Navy Reserve Officers Training Corps ("NROTC"), an inactive Naval reserve member, who was injured in accident while in NROTC-owned van returning from "precommissioning physical examination"); *Schoemer v. United States*, 59 F.3d 26, 29-30 (5th Cir. 1995) (*Feres* barred malpractice suit stemming from preenlistment medical exam for Louisiana National Guard, by enlistee who held

inactive status in the Army); *Quintana*, 997 F.2d at 712 (discussed *supra*); *Duffy v. United States*, 966 F.2d 307, 311-12 (7th Cir. 1992) (*Feres* barred suit by reservist alleging he had been called to active duty illegally).

Although I am not aware of a ruling by the Fourth Circuit on this issue, nearly all circuits to have considered the issue have concluded that *Feres* applies to suits by dual status National Guard military technicians if the injury is otherwise incident to service.  These suits have generally been in the employment discrimination context.  *See, e.g.*, *Wetherill v. Geren*, 616 F.3d 789, 792-97 (8th Cir. 2010); *Walch v. Adjutant General's Dep't of Texas*, 533 F.3d 289, 294-301 (5th Cir. 2008); *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89-93 (2d Cir. 2004); *Wright v. Park*, 5 F.3d 586, 588-91 (1st Cir. 1993).[20]  As noted, as of his surgery, plaintiff was a dual status technician.  ECF 28-1, ¶ 6.

## C.

The parties have not cited to any case addressing the effect of a retroactive change in status on the *Feres* analysis, and the Court has not identified one.  But, I am skeptical of the idea that it is appropriate to classify plaintiff as on active duty, for *Feres* purposes, when he was not on active duty at the time of the alleged injury, and his status was retroactively altered several months later. The Government has not offered any authority suggesting that such a retroactive classification is proper in the context of *Feres*.  And, in *Clenending*, 19 F.4th at 428 n.4, the Fourth Circuit noted that "courts often examine whether the service member was on active duty . . . *at the time the wrongful act occurred*."  (Emphasis added.)  *See also id*. at 430 ("By contrast, at the time of

_____

[20] The one exception is a decision by the Federal Circuit regarding an Equal Pay Act suit. *See Jentoft v. United States*, 450 F.3d 1342 (Fed. Cir. 2006).

Clendening's exposure, he was on active-duty status and stationed on base due to his position as a Marine Corps Officer.").

Colonel Carbonell asserts that, while Carter was on active duty " as a 'medical hold,'" he could "be subjected to the same types of military orders as any other active duty service member." ECF 28-1, ¶ 12.  The June 27, 2018 Order also provides that, while performing under the order, Carter "is subject to the Uniform Code of Military Justice (UCMJ)."  ECF 28-7 at 1.  But, in practice, it is difficult to see how the Government could retroactively issue an order to Carter directing particular conduct on April 6, 2018, or attempt to retroactively apply military discipline. And, an attempt on April 6, 2018, to give Carter an order, or discipline him, would presumably have been met with considerable confusion, given that Carter had not yet been retroactively classified as on active duty.

However, even if I do not embrace the Government's argument as to Carter's active duty status, this does not lead to denial of the Motion.  It simply means that a more holistic analysis is required.  The case law discussed above does not present an obvious answer.  And, it is plaintiffs' burden to demonstrate that sovereign immunity has been unequivocally waived.  *See Clendening*, 19 F.4th at 426; *Welch*, 409 F.3d at 651.  Given the "vast coverage of the *Feres* doctrine" that the Fourth Circuit has repeatedly recognized, *Clendening*, 19 F.4th at 427, I readily conclude that this case falls within the ambit of *Feres*.

The *Feres* "'incident to service test is implicated'" when "'a complaint asserts injuries that stem from the relationship between the plaintiff and the plaintiff's service in the military.'" *Clendening*, 19 F.4th at 427 (quoting *Cioca*, 720 F.3d at 515); *see also Clendening*, 19 F.4th at 427-28 (noting that "'in recent years the [Supreme] Court has embarked on a course dedicated to broadening the *Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military

personnel that are even remotely related to the individual's *status* as a member of the military") (quoting *Stewart*, 90 F.3d at 105) (first alteration in *Clendening*; remainder in *Stewart*).

Such a relationship seems apparent here.  Carter was injured in the context of medical treatment at a military hospital by military doctors; the treatment was for a medical condition that occurred during his basic training, when he was on active duty.  Although Carter was not on active duty at the time of the surgery, he was a member of the Air National Guard and a full-time dual status military technician, with substantial connection to the military.  And, his eligibility for his medical treatment at Walter Reed flowed directly from his military status.

The suit is of the type that would implicate the judiciary in military discipline and decision making, as it has been broadly defined for *Feres* purposes.  I canvass these issues below.

*Clendening*, 19 F.4th at 428, identified relevant considerations in the *Feres* analysis as including "the duty status of the service member,[1] whether the injury took place on base, and what activity the service member was engaged in at the time."  As to the second and third considerations, the injuries here took place at a military hospital, while the plaintiff was undergoing medical treatment provided by hospital personnel, including military doctors.  *See, e.g.*, ECF 1, ¶¶ 12, 13, 18, 24, 25; ECF 18-9, ¶¶ 2, 11-13.  Although these circumstances are not necessarily dispositive in the way they might be if Carter had been on active duty status, they clearly are significant considerations pointing in favor of the application of *Feres*, as numerous cases reflect.  *See, e.g.*, *Jackson*, 110 F.3d at 1487-89; *Quintana*, 997 F.2d at 712; *Kendrick*, 877 F.2d at 1202-04; *Appelhans*, 877 F.2d at 311; *Scheppan*, 810 F.2d at 462-63; *Colon*, 320 F. Supp. 3d at 740-41; *Rowe*, 37 F. Supp. 2d at 426-27.

In their Opposition, plaintiffs characterize Walter Reed as merely a "government hospital," and not a "military base."  ECF 21-1 at 20, 23, 27.  This is not accurate.  Walter Reed is a hospital,

to be sure.  But it is a "military hospital," also known as a military "treatment facility," managed

by the DHA, an agency within the DoD.  ECF 18-9, ¶ 2.  Its full name is the "Walter Reed National

*Military* Medical Center."  *Id*. ¶ 1 (emphasis added).  According to Franz, the Associate General

Counsel at the DHA, civilians are generally ineligible for medical care at Walter Reed as a matter

of law and policy; "receiving treatment at [Walter Reed] is an exclusive benefit to members of the

military and their dependents."  *Id*. ¶ 19.  The medical professionals on the Walter Reed staff who

performed Carter's treatment at Walter Reed included "military doctors."  *Id*. ¶ 12.  And, Walter

Reed has been implicated in numerous claims in which *Feres* has been successfully invoked.  *See,*

*e.g.*, *Colon*, 320 F. Supp. 3d at 740-41; *Rowe*, 37 F. Supp. 2d at 426-27; *Davis v. U.S. Dep't of the*

*Army*, 602 F. Supp. 355, 356-59 (D. Md. 1985).

Plaintiffs also emphasize that Carter's surgery was "elective," and not in support of any

military mission or order.  ECF 21-1 at 19-20.  It is not clear that the elective nature of a surgery

has been a meaningful factor in other cases applying *Feres* to medical malpractice suits involving

military hospitals.  *See, e.g.*, *Appelhans*, 877 F.2d at 311; *Scheppan*, 810 F.2d at 462-63; *Rowe*, 37

F. Supp. 2d at 426-27.  Indeed, in *Scheppan*, 810 F.2d at 462, the Fourth Circuit explicitly

described the plaintiff's surgery as "elective," before going on to hold that *Feres* precluded the

suit.

In any case, the evidence provided by the Government in the Motion—which has not been

contested by plaintiffs—reflects that the medical conditions that prompted Carter to seek surgery

stemmed from an injury sustained by Carter at basic training in 2010.  *See* ECF 18-2, ¶ 8; ECF 18-

9, ¶¶ 5-9; ECF 28-1, ¶ 8.  This root cause, although again not dispositive, strengthens the

relationship between the surgery and Carter's military service and status.  In that respect, it is

similar to the other cases discussed above that applied *Feres*, in the context of reservists or

members of the National Guard, to treatment for an injury sustained during active duty service. *See, e.g.*, *Jackson*, 110 F.3d at 1487-89; *Quintana*, 997 F.2d at 712; *Rowe*, 37 F. Supp. 2d at 426-27.

The other *Clendening* consideration is the duty status of the service member.  19 F.4th at 428.  As discussed, I do not agree with the Government that, at the time of surgery, Carter was on active duty status based on the retroactive application of the June 27, 2018 Order.  *See* ECF 1, ¶¶ 23, 41; ECF 28-1, ¶¶ 7-11.  But, plaintiffs' attempt to depict Carter as having minimal connection to military service also misses the mark.  *See, e.g.*, ECF 21-1 at 8 ("As of April 2018, Mr. Carter was, for all intents and purposes, a military veteran seeking surgical care from a government health care facility. Mr. Carter's claims are no different than the congressionally authorized medical negligence claims routinely asserted by military veterans against Veterans Administration medical centers nationwide in accordance with the FTCA.").

As stated, at the time of Carter's surgery, and since at least 2017, Carter was a member of the Air National Guard, and a full-time dual status military technician.  ECF 18-9, ¶ 18; ECF 28-1, ¶ 6.  Although military technicians are nominally civilian employees, the Fifth Circuit has commented that "the military character of their service is extensive."  *Walch*, 533 F.3d at 296; *see also Wetherill*, 616 F.3d at 791 ("[Plaintiff, an Army National Guard colonel, was] a 'dual-status' National Guard technician, which meant that she was paid as a civilian employee under the Civil Service system, but her job required her at all times to be an officer of the National Guard, and she worked in uniform.").  Under the governing statute, military technicians may be employed only in support of certain specified types of work in support of the National Guard, Armed Forces, or DoD.  *See* 32 U.S.C. § 709(a).

Moreover, Carter's activities with the Air National Guard were not confined to the annual and weekend training required of all inactive duty National Guard members, as the Opposition implies. *See* ECF 21-1 at 19-20. To the contrary, only weeks before his surgery, Carter finished a nearly six-month active duty tour, supporting work on Operation Freedom's Sentinel. ECF 2-16; ECF 28-1, ¶¶ 7-8; ECF 28-2; ECF 28-3; ECF 28-4. There is no indication from the materials that Carter was near retirement, or that this sort of work was an aberration. *Cf. Kendrick*, 877 F.2d at 1205 (noting the disruptive effect on military discipline of permitting a tort suit against the military by a "service member . . . later returned to active duty.").

In short, notwithstanding that Carter was not on active duty status as of April 6, 2018, his professional circumstances were marked by a pervasive entanglement with military service. If duty status is a "spectrum," as the Fourth Circuit put it in *Clendening*, 19 F.4th at 428 n.4, then Carter's status surely ranks as somewhere in the middle, as opposed to simply on the inactive side, as plaintiffs assert. Indeed, this is consistent with the consensus among the circuit courts that *Feres* applies, as a general matter, to suits by reservists, members of the National Guard, and dual status technicians. *See Wetherill*, 616 F.3d at 792-97; *Walch*, 533 F.3d at 294-301; *Overton*, 373 F.3d at 89-93; *Jackson*, 110 F.3d at 1487-89; *Wake*, 89 F.3d at 57-62; *Schoemer*, 59 F.3d at 29-30; *Wright*, 5 F.3d at 588-91; *Quintana*, 997 F.2d at 712; *Duffy*, 966 F.2d at 311-12; *see also Rowe*, 37 F. Supp. 2d at 426-27.

These circumstances, in my view, distinguish Carter's case from *Brown* and *Bradley*, which present the strongest arguments for plaintiffs' position. Both of these cases featured substantially more tenuous relationships between the injured party and the military. *Brown*, 348 U.S. at 110, 112, concerned a "discharged veteran" who received treatment at a Veterans Administration facility, and whose injury occurred "while he enjoyed a civilian status." *Bradley*,

for its part, involved a service member on the TDRL, who "was required only to present herself for periodic medical examinations," and little more.  161 F.3d at 781.  The Fourth Circuit characterized this status as "not a full discharge, [but] comparable to permanent retirement status." *Id*. at 782.  Indeed, in *Appelhans*, 877 F.2d at 310, 312, the plaintiff's indefinite excess leave status, pending review of his court-martial, meant that he received no pay and could hold full-time civilian employment.  Unlike Carter, the plaintiff in *Appelhans* was considered to be on active duty.  But, in practice, Carter's connection to military service seems, if anything, more significant than that of the *Appelhans* plaintiff.  In other words, this is not the "'truly independent or post-service tort'" recognized in *Bradley*.  161 F.3d at 782 (quoting *Kendrick*, 877 F.2d at 1204 n.2).

Moreover, although I do not regard Carter as having active duty status based on his retroactive conversion, the circumstances of his conversion are noteworthy.  The conversion itself buttresses the overall conclusion that Carter was more than inactive.

Carter's conversion was only possible because of his preexisting, ongoing membership in the Air National Guard.  *See* 10 U.S.C. § 12301(h); ECF 28-7.  The text of the statute reflects that this activation may only occur "with the consent of the member," *i.e.*, Carter.  10 U.S.C. § 12301(h)(1).  And, the June 27, 2018 Order describes the activation as "voluntary."  ECF 28-7 at 2.  According to Colonel Carbonell, this retroactive conversion was done at Carter's request, in order to ensure his eligibility for various medical benefits.  ECF 28-1, ¶¶ 13-14.  Notably, plaintiffs have not challenged the validity of the retroactive change.

It is clear that Carter's eligibility for his medical treatment stemmed directly from his status as a member of the Air National Guard.  *See* ECF 18-2, ¶ 10; ECF 18-9, ¶ 19.[21]  Indeed, Carter

---

[21] As noted, there is some confusion as to whether Carter needed to be on active duty status to be eligible for the medical treatment that he received at Walter Reed. *Compare* ECF 18-9, ¶ 19 *with* ECF 28-1, ¶¶ 9-10. But, this is a separate issue.

had a history of receiving medical care from military hospitals such as Walter Reed.  ECF 18-9, ¶ 7.  At an evaluation at Walter Reed on March 1, 2018, while Carter was on active duty status, the surgery was recommended.  *Id.* ¶ 9.  This circumstance reinforces the relationship between Carter's injury and his military service.  *See, e.g.*, *Jackson*, 110 F.3d at 1488-89 ("[The plaintiff] received cost-free treatment at the Naval Hospital . . . as a benefit of service in the Naval Reserve and pursuant to [his] military benefits."); *Quintana*, 997 F.2d at 712 ("[The plaintiff] is a servicemember who was entitled to the surgery at Kirtland precisely because of her military status and the surgery was performed by military servicemembers in a military hospital."); *Appelhans*, 877 F.2d at 312 (noting that "excess leave personnel," such as the plaintiff, "can obtain free health care at military facilities"); *Bon v. United States*, 802 F.2d 1092, 1095 (9th Cir. 1980) (considering as relevant in *Feres* analysis if plaintiff enjoyed a benefit "solely by virtue of her status as a member of the military"); *Colon*, 320 F. Supp. at 740 (plaintiff received her treatment "solely because she was a member of the military"); *Rowe*, 37 F. Supp. 2d at 427 ("[T]he *Feres* doctrine was applicable because the service member was, indeed, only entitled to treatment at a military medical facility in the first place because of her status as a member—*qua* member—of the Armed Forces.").

In the Opposition, plaintiffs argue that their claims do not implicate military discipline or sensitive military matters, a rationale for *Feres* they criticize in any case.  ECF 21-1 at 16, 25-27.  In particular, they contend that their claims would not impact the willingness of military personnel to follow orders, nor the willingness of decision makers subject to suit to act decisively.  *Id.* at 26.

Plaintiffs' approach to this analysis is too cramped.  The *Feres* case law approaches these issues broadly, and with extreme generality.  As discussed, *Feres* looks to "whether the plaintiff's claims 'are the *type* of claims that, if generally permitted, would involve the judiciary in sensitive

military affairs at the expense of military discipline and effectiveness.'" *Stewart*, 90 F.3d at 106 (quoting *Shearer*, 473 U.S. at 59) (emphasis in *Shearer*). This rationale "does not arise only when the lawsuit calls into question the orders of a superior officer," and "the relevant inquiry is not whether the particular lawsuit involves a challenge to a military order." *Stewart*, 90 F.3d at 106. The Supreme Court has "'explicitly rejected a special factors analysis which would consider how military discipline would actually be affected in a particular case.'" *Aikens*, 811 F.3d at 651 (quoting *Ricks*, 295 F.3d at 1130).

Thus, the Fourth Circuit has explained that *Feres* bars a vehicle accident tort suit, because litigating suits alleging "that a service member acted negligently while discharging his military duties . . . could affect military discipline and decisions." *Stewart*, 90 F.3d at 106. The Court said, *id.* (quoting *Johnson*, 481 U.S. at 691):

> This is because "military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word."

For example, the *Stewart* Court indicated that the case would involve an assessment of military vehicle regulations. *Stewart*, 90 F.3d at 106. It would also require "service members involved, any eyewitnesses, and military medical personnel . . . 'to testify in court as to each other's decisions and actions.'" *Id.* at 106 (quoting *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 673 (1977)) (ellipsis added).

Similarly, the Fourth Circuit remarked in *Kendrick*, 877 F.2d at 1205, regarding a medical malpractice suit: "A tort suit based upon service-related injuries necessarily implicates military judgments and decisions integral to the execution of the military mission." A judgment for the plaintiff in the case, it said, would imperil the military's ability to make effective decisions

regarding disability and compensation, and would undermine "government authority and discipline." *Id*. at 1206.

This logic certainly applies to plaintiffs' suit.  For similar reasons, the medical malpractice suit here, involving medical treatment by military personnel at a military hospital and necessarily questioning the conduct of those personnel, could affect "military discipline and decisions." *Stewart*, 90 F.3d at 106.  Service members, eyewitnesses, and Walter Reed medical personnel would more than likely be required to testify at a trial, or at least be deposed.  And, the Court might be required to scrutinize, and pass judgment on, military policy, such as procedures for surgery, testing, diagnosis, referral, and informed consent (*see* ECF 1, ¶ 48); procedures for the internal review and discipline of military medical personnel; and issues relating to status and benefits.

Finally, to the extent that the three rationales underpinning *Feres* should be considered, *see Colon*, 320 F. Supp. 3d at 739-40, they weigh in favor of applying the doctrine.  The issue of military discipline has been discussed above.  The rationale regarding the "distinctly federal nature of the relationship" between the Government and service members, which ought to preempt local tort law, applies here just as much as to any injury incident to service.  *Kendrick*, 877 F.3d at 1204 (applying this rationale in a medical malpractice case).  And, as to the availability of existing, alternative compensation schemes, plaintiffs concede in the Opposition that "[c]ertain aspects of Mr. Carter's medical care are likely covered by his [Veterans Benefits Act] benefits," although they argue that the "true cost" of his injury will not be addressed, especially given problems in the provision of veterans' health care.  ECF 21-1 at 23-24.

Indeed, the record reflects that since April 2018, Carter has been receiving VA health care to recover from his injuries.  ECF 1, ¶¶ 38-40, 42-43; ECF 18-9, ¶¶ 14-17.  In addition, Carter may

also receive disability compensation as a result of his medical retirement, due to 100 percent physical disability.  ECF 18-2, ¶ 9; ECF 18-8 at 1-5, 11-15.[22]

Finally, as noted, Congress recently amended the Military Claims Act ("MCA") to permit the payment of medical malpractice claims against DoD health care providers, when incident to service.  *See* 10 U.S.C. § 2733a.  This could provide an additional avenue for recovery by plaintiffs.  Indeed, they appear to have submitted such claims in March 2020.  *See* ECF 1, ¶ 20; ECF 2-8; ECF 2-10; ECF 2-12.  This issue is discussed, *infra*.

Courts must be "'mindful that, since its inception, the *Feres* doctrine has been broadly and persuasively applied by federal courts . . . .'"  *Colon*, 320 F. Supp. 3d at 740 (quoting *Stewart*, 90 F.3d at 104) (alteration in *Colon*).  Consistent with this principle, I conclude that *Feres* bars plaintiffs' tort claims.

## D.

As noted, plaintiffs' Complaint appears to assert the "NDAA" as a basis for suit.  *See* ECF 1, ¶¶ 17, 19, 20.  Therefore, I briefly examine this issue.

Although the Complaint refers to the NDAA, the actual provision of law cited in the Complaint—10 U.S.C. § 2733—is a portion of the Military Claims Act, 10 U.S.C. § 2731 *et seq*.  Conversely, "NDAA" is the name given to the defense policy bill annually passed by Congress.  *See, e.g.*, National Defense Authorization for Fiscal Year 2022, Pub. L. No. 117-81, 135 Stat. 1541 (2021).

---

[22] The potential receipt of such benefits is suggested by the materials provided by the Government. For example, a letter of October 28, 2019, from the VA to Carter indicates that he may be entitled to monthly VA compensation in the amount of $8,919.54, based on his disability status. ECF 18-8 at 5. However, the parties do not discuss this specific issue.

To the extent that plaintiffs seek to bring suit under the MCA, they may not do so.   The MCA "provides that the secretaries of the military departments 'may' settle claims against the United States for, *inter alia*, personal injury or death caused by a civilian officer or employee of their departments or a member of the Army, Navy, or Air Force acting within the scope of their employment, or otherwise incident to noncombat activities of their department."   *Minns v. United States*, 974 F. Supp. 500, 507 (D. Md. 1997) (quoting 10 U.S.C. § 2733(a)), *aff'd*, 155 F.3d 445. However, a claim may not be "for personal injury or death of such a member or civilian officer or employee whose injury or death is *incident to his service*."   10 U.S.C. § 2733(b)(3) (emphasis added).

Furthermore, "[n]otwithstanding any other provision of law, the settlement of a claim under [the MCA] is final and conclusive."   *Id*. § 2735.   "The great weight of authority addressing the MCA . . . holds that absent a constitutional violation, the disallowance of an MCA claim is not subject to judicial review."   *Minns*, 974 F. Supp. at 507 (collecting cases).   In other words, the MCA does not provide an alternative cause of action under which plaintiffs may file suit, apart from the FTCA.[23]

The Government suggests (ECF 18-1 at 15-17) that plaintiffs' use of the term "NDAA" is a reference to the amendment to the MCA contained in the National Defense Authorization Act for Fiscal Year 2020. *See* Pub. L. No. 116-92, Div. A, Title VII, Subtitle C, § 731(a)(1), 133 Stat. 1198, 1157-60 (2019).   Codified at 10 U.S.C. § 2733a, this new section provides that the Secretary of Defense "may allow, settle, and pay a claim against the United States for personal injury or death *incident to the service* of a member of the uniformed services that was caused by the medical

---

[23] There is no suggestion that plaintiffs present a constitutional claim.

malpractice of a Department of Defense health care provider." 10 U.S.C. § 2733a(a) (emphasis added).[24] The authorization of payments for medical malpractice claims does, indeed, appear relevant to plaintiffs' circumstances.

However, in the Opposition, plaintiffs expressly reject any reliance on 10 U.S.C. § 2733a, which they refer to in the Opposition as the "NDAA." ECF 21-1 at 27-28. This is for a straightforward reason: § 2733a only authorizes payments for injury or death "incident to . . . service," and the entire crux of plaintiffs' argument is that Carter's injuries were *not* incident to service. In any case, the limitations on judicial review applicable to the MCA as a whole apply to claims under 10 U.S.C. § 2733a. *See* 10 U.S.C. § 2735; *see also* 32 C.F.R. § 45.14(a) ("As provided in 10 U.S.C. 2735, the adjudication and settlement of a claim under this part is final and conclusive and not subject to review in any court. Unlike the FTCA, the Military Claims Act, 10 U.S.C. chapter 163, which provides the authority for this part, does not give Federal courts jurisdiction over claims.").

Although plaintiffs make clear in the Opposition that they do not rely on 10 U.S.C. § 2733a, they do not actually explain what they meant in the Complaint by invoking the NDAA, or by citing 10 U.S.C. § 2733. Indeed, the Opposition could be read to indicate that plaintiffs only base their suit on the FTCA. *See* ECF 21-1 at 18 ("Mr. Carter's congressionally authorized civil claims were appropriately brought pursuant to the plain meaning of the FTCA.").

---

[24] The provision applies to any claim filed on or after January 1, 2020. *See* Pub. L. No. 116-92, § 731(d)(1), 133 Stat. 1460. Claims filed in calendar year 2020 "must be presented to [DoD] in writing within three years after the claim accrues." 32 C.F.R. § 45.2(c)(2).

Plaintiffs' "Military Claims" were filed on March 24, 2020. ECF 1, ¶ 41; *see* ECF 2-8; ECF 2-10; ECF 2-12. And, the allegedly botched surgery occurred on April 6, 2018, or within two years of when plaintiffs filed their claims.

Given that no part of the MCA can provide a basis for plaintiffs' suit, this is largely an academic exercise.  This issue does not alter the conclusion that the Motion should be granted. Still, the use of the "incident to . . . service" language in 10 U.S.C. § 2733a suggests an awareness by Congress that the *Feres* doctrine has precluded recovery by service members of at least some medical malpractice claims.  After all, "it is a 'cardinal rule of statutory construction' that, when Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'"  *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 292 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)).  In addition, as discussed above, the potential availability of 10 U.S.C. § 2733a as a means of providing some recovery to Carter may buttress the application of *Feres* to his case.

## IV.  Conclusion

For the reasons stated above, I shall grant the Motion and dismiss the case for lack of subject matter jurisdiction under the *Feres* doctrine.

An Order follows, consistent with this Memorandum Opinion.

Date:  May 24, 2022                              _____/s/_____
                                                 Ellen L. Hollander
                                                 United States District Judge